UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

WILD EGGS HOLDINGS, INC.; WILD                                      Plaintiffs
EGGS OPERATIONS, LLC; AND WILD
EGGS FRANCHISING, LLC.

v.                                           Civil Action No. 3:20-CV-501-RGJ

STATE AUTO PROPERTY & CASUALTY                                      Defendant
INSURANCE COMPANY

* * * * *

## MEMORANDUM OPINION AND ORDER

Defendant State Auto Property & Casualty Insurance Company  ("State Auto") moves to dismiss Plaintiffs Wild Eggs Holdings, Inc.'s, Wild Eggs Operations, LLC.'s, and Wild Eggs Franchising, LLC's (collectively "Wild Eggs") amended complaint.  [DE 29].  Briefing is complete [DE 30; DE 31] and this matter is ripe.  For the reasons below, the Court **GRANTS** Defendants' Motion to Dismiss Amended Complaint [DE 29 ].

## I.       BACKGROUND

On March 11, 2020, the World Health Organization "announced that the outbreak of the novel COVID-19, a contagious and infectious disease, constituted a worldwide pandemic."  [DE 28 at 1182].  Two days later, President Trump "declared a nationwide emergency due to the public health emergency caused by the COVID-19 outbreak in the United States."  *Id.*  The Governors of Kentucky, Indiana, and Ohio issued executive orders (the "Orders") to slow the spread of COVID-19 in their states.  *Id.* at 1185-87.  Wild Eggs, a "breakfast, brunch, and lunch restaurant chain in Kentucky, Ohio, and Indiana," alleges that these Orders "resulting from the physical damage of the 2020 COVID-19 pandemic outbreak forced Wild Eggs to close dine-in operations and rendered its restaurants untenantable and unsuitable for restaurant operations.   Restricting Wild Eggs'

1

premises to curbside pickup and delivery substantially reduced Wild Eggs' business income and required extra expense." *Id.* at 1187.

Wild Eggs held a Preferred Business Policy ("Policy") from State Auto. *Id.* at 1189. The Policy covered Wild Eggs' locations in Kentucky, Indiana, and Ohio. *Id.* at 1190. State Auto issued the Policy to Wild Eggs on April 20, 2019 with coverage ending on April 20, 2020. *Id.* at 1189. On March 18, 2020, Wild Eggs filed an insurance claim with State Auto "for business losses resulting from suspension of its restaurant operations due to actual or alleged exposure to COVID-19, a contagious and infectious virus, and resulting adverse public communications or media reports and government orders." *Id.* at 1193. After State Auto denied its claim on April 8, 2020, Wild Eggs sued in this Court requesting declaratory judgment against State Auto and asserting state-law claims of breach of contract, bad faith, unfair claim settlement practices, and deceptive and misleading advertising. [DE 1].

## II.   DISCUSSION

### A. Jurisdiction

Wild Eggs brings this action under the Declaratory Judgment Act. [DE 28 at 1195]. While the Act authorizes district courts to exercise jurisdiction, it does not mandate or impose a duty to do so. *Bituminous Cas. Corp. v. J & L Lumber Co., Inc.*, 373 F.3d 807, 812 (6th Cir. 2004). While neither party has addressed the Court's jurisdiction, the Court will first determine whether the exercise of jurisdiction is appropriate under the circumstances of this case before addressing State Auto's motion to dismiss. *See Berkley Assurance Co. v. Carter Douglas Co., LLC*, No. 1:18-CV-00099-GNS, 2020 WL 201051, at *1 (W.D. Ky. Jan. 13, 2020) ("Although the issue has not been raised, courts are encouraged to, sua sponte, examine the issue of whether to exercise their

discretion in asserting jurisdiction over actions brought pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a)").

The court considers five factors ("*Grand Trunk* factors") to determine whether the exercise of Declaratory Judgment Act jurisdiction is proper. *Grand Trunk W.R.R. Co. v. Consol. Rail Co.*, 746 F.2d 323, 326 (6th Cir. 1984) (internal quotation marks omitted). Although the Court should balance the five factors, the Sixth Circuit has never clarified the relative weights of the factors. *Id.* at 326.

The first two *Grand Trunk* factors assess "(1) whether the declaratory action would settle the controversy" and "(2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue." *Grand Trunk*, 746 F.2d at 326. Because "it is almost always the case that if a declaratory judgment will settle the controversy, . . . it will clarify the legal relations in issue," the inquiries required by these two factors often overlap substantially. *United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 397 (6th Cir. 2019) (citing *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 557 (6th Cir. 2008); *Bituminous*, 373 F.3d at 814; and *Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 454 (6th Cir. 2003)).

There are two lines of cases in the Sixth Circuit. *United Specialty Ins. Co. v. Cole's Place, Inc.*, No. 3:17-CV-00326-TBR, 2018 WL 1914731, at *4 (W.D. Ky. Apr. 23, 2018), *aff'd*, 936 F.3d 386 (6th Cir. 2019) (citing *Flowers*, 513 F.3d at 555). "One line of cases approved of declaratory actions because they can 'settle the insurance coverage controversy,' while a second line of cases disapproved of declaratory actions because while they 'might clarify the legal relationship between the insurer and the insured, they do not settle the ultimate controversy.'" *Id*. (quoting *Flowers*, 513 F.3d at 555).

This action falls into the first line of cases.  The parties dispute whether the Policy covers damages arising from Wild Eggs' alleged inability to fully operate during the COVID-19 pandemic.  There are no fact-bound issues of state law awaiting resolution in the state-court litigation.  *See Bituminous*, 373 F.3d at 813–14.  As a result, this declaratory judgment action will "settle the controversy," as it resolves the dispute between the insurer and insured over coverage. *See, e.g.*, *W. World Ins. Co. v. Hoey*, 773 F.3d 755, 760–61 (6th Cir. 2014).  The first two *Grand Trunk* factors therefore support the exercise of jurisdiction.

The third factor considers "whether the use of the declaratory judgment action is motivated by 'procedural fencing' or [is] likely to create a race for res judicata."  *Flowers*, 513 F.3d at 558. Based on the parties' pleadings, there is no competing state court declaratory action.  Thus, the third *Grand Trunk* factor supports the exercise of jurisdiction.

The fourth *Grand Trunk* factor addresses "whether accepting jurisdiction would increase friction between federal and state courts" and is broken into three sub-factors.  *Flowers*, at 559. The first sub-factor "focuses on whether the state court's resolution of the factual issues in the case is necessary for the district court's resolution of the declaratory judgment action."  *Flowers*, 513 F.3d at 560.  Here, any factual determinations the Court may have to make will not overlap with those in a state court action because there is no state court action pending.  As a result, this sub-factor supports exercising jurisdiction.

The second sub-factor examines "which court, federal or state, is in a better position to resolve the issues in the declaratory action."  *Id.*  The Sixth Circuit has "found that 'issues of insurance contract interpretation are questions of state law with which the Kentucky state courts are more familiar and, therefore, better able to resolve.'"  *Id.* at 561 (quoting *Travelers Indem. Co. v Bowling Green Prof. Assoc.*, 495 F.3d 266, 273 (6th Cir. 2007)).  The questions that would arise

4

here do not, however, involve novel issues of Kentucky law.  The novel factor of the COVID-19 pandemic does not make this action inappropriate for this Court to consider because it involves application of well-established Kentucky principles of insurance policy interpretation.  *See Cole's Place, Inc.*, 2018 WL 1914731 at *8.  The second sub-factor therefore is neutral.

The third sub-factor "focuses on whether the issue in this federal action implicates important state policies and is, thus, more appropriately considered in state court." *Flowers*, 513 F.3d at 561.  Kentucky state courts are "more familiar and, therefore, better able to resolve" interpretation of insurance contracts.  *Id*.  Even when the state law is not difficult to apply, the Sixth Circuit has usually found "that the interpretation of insurance contracts is closely entwined with state public policy." *Cole's Place, Inc.*, 936 F.3d at 401, citing *e.g*., *Flowers*, 513 F.3d at 561 and *Travelers*, 495 F.3d at 273.  Because this action involves the application of Kentucky law to an insurance contract, the third sub-factor counsels against exercising jurisdiction.

The fifth and final factor asks "whether there is an alternative remedy which is better or more effective" than federal declaratory relief.  *Grand Trunk*, 746 F.2d at 326.  Kentucky law provides a declaration of rights procedure under KRS § 418.040.  *Mass. Bay Ins. Co. v. Christian Funeral Dirs., Inc.*, No. 18-5267, 2018 WL 6787945, at *8 (6th Cir. Dec. 26, 2018).  The Sixth Circuit has held that, "[i]n many ways, this alternative would have been better." *Flowers*, 513 F.3d at 562.  Specifically,"[t]he Kentucky courts are in a superior position to resolve undecided questions of state law," and "Kentucky courts might also have been able to combine the two actions so that all issues could be resolved by the same judge." *Id.*  For these reasons, overall, the fifth *Grand Trunk* factor weighs against exercising jurisdiction.

As noted above, the Sixth Circuit has never suggested the relative weight of the factors; instead, "[t]he relative weight of the underlying considerations of efficiency, fairness, and

federalism will depend on facts of the case." *Cole's Place, Inc.*, 936 F.3d at 402 (citing *Hoey*, 773 F.3d at 759). Further,"[t]he essential question is always whether [the court] has taken a good look at the issue and engaged in a reasoned analysis of whether issuing a declaration would be useful and fair." *Id*. (citing *Hoey,* 773 F.3d at 759) (citation omitted). Having evaluated those factors, the first three factors support exercising jurisdiction, as does one of the sub-factors of the fourth factor. Because of the importance of these factors, the exercise of the Court's discretionary jurisdiction is appropriate.

## B.  Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) instructs that a court must dismiss a complaint if the complaint "fail[s] to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). To state a claim, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). When considering a motion to dismiss, courts must presume all factual allegations in the complaint to be true and make all reasonable inferences in favor of the non-moving party. *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citation omitted). "But the district court need not accept a bare assertion of legal conclusions." *Tackett v. M & G Polymers*, USA, LLC, 561 F.3d 478, 488 (6th Cir. 2009) (citation omitted). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).

To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "A complaint will be dismissed . . . if no law supports the claims made, if the facts alleged are insufficient to state a claim, or if the face of the complaint presents an insurmountable bar to relief." *Southfield Educ. Ass'n v. Southfield Bd. of Educ.*, 570 F. App'x 485, 487 (6th Cir. 2014) (citing *Twombly*, 550 U.S. at 561–64).

The parties agree that the Policy is governed by Kentucky law. [DE 29 at 1454; DE 30 at 1907]. To determine whether coverage exists, the Court begins by interpreting the relevant insurance contract. *Stone v. Ky. Farm Bureau Mut. Ins. Co.*, 34 S.W.3d 809, 810 (Ky.Ct.App.2000). "The primary object in construing a contract . . . is to effectuate the intentions of the parties." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384 (Ky.Ct.App.2002). The parties' intentions are to be discerned from the four corners of the contract. *Id.* In the absence of any ambiguities, the Court enforces the terms as written. *McMullin v. McMullin,* 338 S.W.3d 315, 320 (Ky.Ct.App.2011) (citing *Whitlow v. Whitlow,* 267 S.W.2d 739, 740 (Ky.1954)).

"A contractual provision is ambiguous if the provision is susceptible to multiple or inconsistent interpretations." *McMullin,* 338 S.W.3d at 320. Contractual terms are assigned their ordinary meaning, *Frear v. P. T.A. Indus., Inc.,* 103 S .W.3d 99, 106 (Ky.2003), and courts are "simply unwilling to torture words to import ambiguity into a contract where the ordinary meaning leaves no room for ambiguity." *First Home, LLC v. Crown Communications, Inc.,* No.2010–CA–001701–MR, 2012 WL 95560 at *5 (Ky.Ct.App. Mar. 15, 2012). That said, the contract should be liberally construed and all ambiguous terms resolved in favor of the insured. *Ky. Farm Bureau Mut. Ins. Co. v. McKinney,* 831 S.W.2d 164, 166 (Ky.1992).

Wild Eggs asserts that the Policy provides coverage for its losses related to the COVID-19 pandemic under: (1) The Restaurant Extension Endorsement; and (2) The Business Income (And Extra Expense) Coverage Form.  [DE 30 at 1908].  State Auto contends that, as a matter of law, neither one of these provisions provides coverage for Wild Eggs' alleged losses.  [DE 29 at 1447].

1.  <u>The Restaurant Extension Endorsement</u>

The Restaurant Extension Endorsement provides:

C. If the BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM or the BUSINESS INCOME (WITHOUT EXTRA EXPENSE) COVERAGE FORM is attached to the policy, the following additional provisions apply:

1. The Causes of Loss applicable to the Business Income Form attached to this policy shall also include the following:

a. The "suspension" of your "operations" at the described premises due to the order of a civil authority; or adverse public communications or media reports, resulting from the actual or alleged:

. . .

(2) Exposure of the described premises to a contagious or infectious disease.

[DE 28-1 at 1305].

The Policy defines "suspension" as the "[t]he slowdown or cessation of your business activities" or "[t]hat a part or all of the described premises is rendered untenable."  *Id.* at 1359. The "described premises" are the Wild Eggs' restaurants and office buildings named in the Policy. [DE 28 at 1190].

State Auto argues that Wild Eggs has failed to plausibly alleged coverage under the Restaurant Endorsement Extension because the Orders did not "result[] from" the "actual or alleged [e]xposure" of the COVID-19 virus at the "described premises."  [DE  29 at 1463-65]. State Auto also argues that "[j]ust as the government operational restrictions were not 'resulting

8

from' any alleged infectious disease 'at the described premises,' it is also true that any media reporting of COVID- 19's impact on the restaurant industry at large does not constitute 'adverse public communications resulting from' any of the specific conditions within the insured's described premises, that were the cause of the suspended operations at issue." *Id.* at 1465.

Wild Eggs does not dispute that "resulting from" requires a "causal connection." [DE 30 at 1913]. But Wild Eggs argues that its allegations satisfy the elements of this provision because they fall within the dictionary definitions of "alleged" and "exposure":

> "[A]lleged exposure" requires only that someone asserted that the premises were subject to the effect or influence of a contagious or infectious disease. As stated in the Amended Complaint, alleged exposures of COVID-19 occurred at Wild Eggs' premises. (Am. Compl. ¶ 41.) Clearly, the civil authorities issuing the orders suspending dine-in services viewed restaurants as subject to the influence of the coronavirus even though they had no proof as to each restaurant affected by the orders. Under the common-sense meanings of the words "alleged" and "exposure," the circumstances here trigger coverage because the civil authorities' orders suspending dine-in services at Wild Eggs restaurants "result[ed] from" – *i.e.*, were caused by – actual or alleged exposure of those restaurants to the coronavirus. The orders were issued because the civil authorities deemed Wild Eggs' restaurants (and other restaurants) to be in an "unsheltered or undefended condition" with respect to the virus, and therefore also "subject" to the "external influence" of the virus. There is no other plausible reason for the orders. The state suspension orders responded to ongoing actual or alleged exposure to COVID-19.

*Id.* at 1913.

In support of its arguments, State Auto cites *Terry Black's Barbecue, LLC v. State Auto. Mut. Ins. Co.*, 514 F. Supp. 3d 896, 902–03 (W.D. Tex. 2021). In *Terry Black's*, the district court considered a Restaurant Extension Endorsement identical to the one in this case. *Id.* at 908. The court found that the allegations in the plaintiff's complaint did not trigger coverage because "the civil authority orders did not result from the actual or alleged exposure to COVID-19 at Plaintiffs' restaurants." *Id.* at 909. Rather, the "civil authority orders were issued in response to the global pandemic, not in response to the actual or alleged presence of the virus that causes COVID-19 at

Plaintiffs' restaurants. Accordingly, Plaintiffs have not demonstrated the causal connection required for coverage." *Id.* at 909.

Wild Eggs argues that the Court should disregard *Terry Black's* because it "relied on Texas coverage principles, which differ from Kentucky's," "the insureds did *not* allege the presence of virus at any of the restaurants," and "*Terry Black's* does not represent a consensus view; it surely does not represent the view among courts in this Circuit." *Id.* at 1916 (emphasis in original). First, it is unclear how Texas coverage principles "differ from" Kentucky's. In *Terry Black's*, the district court explained:

> Texas law provides that insurance policies are construed according to common principles governing the construction of contracts, and the interpretation of an insurance policy is a question of law for a court to determine. Unless the policy dictates otherwise, courts give words and phrases their ordinary and generally accepted meaning, reading them in context and in light of the rules of grammar and common usage. The paramount rule is that courts enforce unambiguous policies as written. If policy language is worded so that it can be given a definite or certain legal meaning, it is not ambiguous and courts construe it as a matter of law.
>
> Under Texas contract law, ambiguity means more than lack of clarity. A policy is not ambiguous merely because different parties—or different judges—offer conflicting interpretations. A policy is only ambiguous if, giving effect to all provisions, its language is subject to two or more reasonable interpretations
>
> If a policy is ambiguous, a court must resolve the uncertainty by adopting the construction that most favors the insured. The insured bears the initial burden of showing that there is coverage, while the insurer bears the burden of proving the applicability of any exclusions in the policy.

*Id.* at 902-03 (internal citations, quotation marks, and formatting omitted).

Based on how the court in *Terry Black's* describes it, Texas coverage law appears to be similar Kentucky's. Second, while Wild Eggs is correct that the complaint in *Terry Black's* did not allege the presence of the virus at any of its restaurants, the complaint there, like the one here, failed to plausibly allege that the civil orders were issued as a "result[] of" the conditions at the "described premises." Third, Wild Eggs cited no authority (and the Court could not find any) in

support of its assertion that *Terry Black's* "does not represent a consensus view; it surely does not represent the view among courts in this Circuit."

The Court is also unpersuaded by Wild Eggs' interpretation of the meaning of the phrase "alleged exposure." "Alleged" and "exposure" are not defined in the Policy. "Where terms in insurance policies are undefined, Kentucky courts typically refer to dictionary definitions to give the terms their ordinary meaning as persons with the ordinary and usual understanding would construe them." *Meridian Citizens Mut. Ins. Co. v. Horton*, No. CIVA5:08CV302 KKC, 2010 WL 1253084, at *5 (E.D. Ky. Mar. 25, 2010) (citation and quotation marks omitted).

"Alleged" means "asserted to be true or to exist." *Alleged*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/alleged (last visited Sep. 14, 2021).

"Exposure" means:

1. the fact or condition of being exposed: such as
   a. the condition of being presented to view or made known
   *a politician seeks a lot of exposure*
   b. the condition of being unprotected especially from severe weather
   *died of exposure*
   c. the condition of being subject to some effect or influence
   *risk exposure to the flu*
   d. the condition of being at risk of financial loss
   *minimizes your exposure to market fluctuations*

2. the act or an instance of exposing: such as
   a. disclosure of something secret
   *tried to prevent exposure of their past*
   b. the treating of sensitized material (such as film) to controlled amounts of radiant energy also : the amount of such energy or length of such treatment
   *a 3-second exposure*

3.
   a. the manner of being exposed
   b. the position (as of a house) with respect to weather influences or compass points
   *a room with a southern exposure*

4. a piece or section of sensitized material (such as film) on which an exposure is or can be made
>    *36 exposures per roll*

*Exposure*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary /exposure (last visited Sep. 14, 2021).

As illustrated by the above definitions, the meaning of "exposure" is often determined by the preposition that follows before or after it.[1]  This is because different prepositions mean different things.  For instance, "to" is used to indicate "contact or proximity" or the "result of an action or a process."  *To*,  MERRIAM-WEBSTER.COM,  https://www.merriam-webster.com/dictionary/to (last visited Sep. 14, 2021).  "Of," on the other hand, is used to indicate "origin and derivation." *Of*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/of (last visited Sep. 14, 2021).  "Exposure to" means something different than "exposure of."  The definition of "exposure" that most applies here is "the act or an instance of exposing" because the example for that definition ("*tried to prevent exposure of their past*") is the only one that uses "exposure of," the phrase used in the Policy.

Wild Eggs is not entitled to coverage under the Restaurant Endorsement Extension because the Orders and the "adverse public communications or media reports" did not "result from" an alleged "act or an instance" of exposure at the "described premises."  Neither the Orders nor the "adverse public communications or media reports" mentioned any alleged acts or instances of exposure at the "described premises." As used in the Policy, "alleged exposure" requires more than "that someone asserted that the premises were subject to the effect or influence of a contagious or infectious disease."  [DE 30 at 1913].  It requires an allegation of an "act or an instance" of exposure at the "described premises."  Although Wild Eggs alleges that civil authorities were

---

[1] Wild Eggs recognizes that prepositions can alter a word's meaning: "'Loss of' property and 'loss to' property are not the same, and the 'loss of' language in the Policy has been interpreted more broadly to encompass loss of property for its intended purpose as a dine-in restaurant."  [DE 30 at 1919].

concerned about the potential presence of COVID-19 inside restaurants and that the news media and other organizations reported on the risk associated with in-person dining, [DE 28 at 1182-85], it has failed to plausibly allege that those concerns or those reports "result[ed] from" the "act[s]" or "instance[s]" of exposure at the "described premises." *See Terry Black's*, 514 F. Supp. 3d at 902–03.

2. <u>The Business Income (And Extra Expense) Coverage Form</u>

*a. Business Income and Extra Expense Coverage*

The Policy provides coverage for losses to business income:

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The suspension must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit Of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.

[DE 28-1 at 1352].

The Policy also provides coverage for extra expenses:

> We will pay Extra Expense (other than the expense to repair or replace property) to:
>
> (1) Avoid or minimize "suspension" of business and to continue operations at then described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location.
>
> (2) Minimize the "suspension" of business if you cannot continue "operations."

*Id.*

The Policy does not define the phrase "direct physical loss of or damage to." State Auto argues that Wild Eggs has failed to plausibly allege "direct physical loss of or damage to" the "described premises."   [DE 29 at 1454-60].  Wild Eggs argues that it has sufficiently alleged

13

"direct physical loss of" property "because the tangible presence of COVID-19 and civil authority orders have prevented it from providing dine-in services at its restaurants." [DE 30 at 1917]. It also argues that it has sufficiently alleged "'damage to' its property because COVID-19 virus particles settled on Wild Eggs' surfaces and its tables, chairs." *Id.* To the extent that Wild Eggs alleges that "direct physical loss" means the inability to access and use the "described premises," State Auto argues that it has failed to plausibly do so because it alleges that the suspension caused the "direct physical loss," but under the provision the "direct physical loss" must cause the suspension. [DE 29 at at 1460]. To the extent that Wild Eggs argues that the "direct physical loss of or damage to" means "physical alteration" to the described premises, State Auto argues that Wild Eggs has failed to allege that the presence of COVID-19 in the air or on surfaces in the "described premises" constitutes "physical alteration." *Id.* at 1457.

Kentucky appellate courts have not extensively examined the meaning of "direct physical loss or damage to" in the context of an insurance policy. Nor has the Sixth Circuit when applying Kentucky law. *Cf. Universal Image Prods., Inc. v. Fed. Ins. Co.*, 475 F. App'x 569, 575 (6th Cir. 2012) (applying Michigan law) ("[W]hile Universal certainly suffered a large inconvenience as a result of the mold and bacterial contamination of the Evergreen building, the damages resulting therefrom are not covered by the insurance policy issued by Federal. Universal did not suffer any tangible damage to physical property, nor were the Evergreen premises rendered uninhabitable or substantially unusable").

The parties cited ample non-binding precedent. [DE 29 at 1455-60; DE 30 at 1919-21]. Based on the Court's review of this precedent, district courts across the country have diverged in how they interpret "direct physical loss of or damage to" in insurance contracts. The majority of district courts, however, agree with State Auto. *See Bluegrass Oral Health Ctr., PLLC v.*

14

*Cincinnati Ins. Co.*, No. 1:20-CV-00120-GNS, 2021 WL 1069038, at *4 (W.D. Ky. Mar. 18, 2021) (collecting cases).  Based on the Court's research, it appears at this time as though only the Eighth and Eleventh Circuits have considered whether the COVID-19 pandemic and the resulting stay-at-home orders constitute "direct physical loss of or damage to."  Both circuits, in line with the majority of district courts, have held that they do not.  *See Oral Surgeons, P.C. v. Cincinnati Ins. Co.,* 2 F.4th 1141, 1145 (8th Cir. 2021)  ("Oral Surgeons did not allege any physical alteration of property. The complaint pleaded generally that Oral Surgeons suspended non-emergency procedures due to the COVID-19 pandemic and the related government-imposed restrictions.  The complaint thus alleged no facts to show that it had suspended activities due to direct 'accidental physical loss or accidental physical damage,' regardless of the precise definitions of the terms 'loss' or 'damage'");  *Gilreath Fam. & Cosm. Dentistry, Inc. v. Cincinnati Ins. Co.*, No. 21-11046, 2021 WL 3870697, at *2 (11th Cir. Aug. 31, 2021)  ("the COVID-19 pandemic and related shelter-in-place order" did not "cause direct 'accidental physical loss' or 'damage' to the dental practice's property").

While the majority position does not determine the outcome here, it is compelling to the Court that most district courts and all circuit courts agree with State Auto's interpretation of the phrase.  Most relevant to the Court's analysis, though, is precedent filtering the meaning of "direct physical loss of or damage to" through the lens of Kentucky law.  Particularly relevant here are recent cases from the Eastern District of Kentucky (*Ashland Hosp. Corp. v. Affiliated FM Ins. Co.*, No. CIV.A. 11-16-DLB-EBA, 2013 WL 4400516, at *1 (E.D. Ky. Aug. 14, 2013) and *LexFit, LLC v. W. Bend Mut. Ins. Co.*, No. CV 5:20-413-DCR, 2021 WL 2382519, at *1 (E.D. Ky. June 10, 2021)) and the Western District of Kentucky (*Bluegrass*).

In *Ashland*, the plaintiff, a hospital, stored all its electronic records on a third-party

vendor's data network.  *Ashland*, 2013 WL 4400516, at *1.  Unfortunately, the data network overheated and the hospital's electronic records were physically corrupted and had to be restored. *Id.* at 2.  After the plaintiff's insurance carrier denied coverage under the "direct physical loss of or damage to" provision of the insurance policy, plaintiff filed a declaratory judgment action.  *Id.* The court framed "the central question" as "whether the phrase 'direct physical loss or damage' includes a loss of reliability suffered by a data storage network due to heat exposure." *Id.* at 4. The court found that "loss of reliability" was covered under the policy's "direct physical loss or damage" provision:

> The phrase "direct physical loss or damage," as applied to Plaintiff's data storage network, encompasses a loss of reliability caused by excessive temperature.  There are two reasons the Court makes this finding.  First, the component damage at issue here is undeniably "direct" and "physical": it is "direct" because the harm flows immediately or proximately from the heat exposure, and it is "physical" because the harm results from physical alteration to the components themselves.
>
> It is undisputed, for instance, that disk drive damage occurs on a microscopic level through a process called "ionic migration," in which "lubricants are thinned or ... move around because they're more fluid [as a result of heat exposure]." It is also undisputed that heat exposure can degrade the disk drives "Annualized Failure Rate," meaning their annual risk of failure—or in other words, their reliability. There is no question, therefore, that degradation of a disk drive's Annualized Failure Rate due to heat exposure is a *physical* process.

*Id.* at 5 (internal citation omitted).

Bluegrass Oral Health Center ("BOHC"), a dental clinic, closed in response to an order from the Kentucky Department of Public Health directing that "all non-emergent medical, surgical, dental, or other health care practices or procedures cease effective the close of business on March 18, 2020." *Bluegrass*, 2021 WL 1069038 at *1.  BOHC sued its insurance company after it refused to provide coverage under the policy's civil authority provision.  *Id.*  The parties disputed the meaning of phrase "direct physical loss" in the policy.  *Id.* at 2.  After reviewing relevant precedent and examining the dictionary definitions of "direct," "physical," and "loss," the court determined:

16

The primary dictionary definition of loss is "destruction" or "ruin." *Loss*, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss (last visited Mar. 17, 2021). Thus, in context, "physical loss" would mean destruction or ruin produced by the forces or operation of physics. *Physical*, Merriam-Webster, https://www.merriamwebster.com/dictionary/physical (last visited Mar. 17, 2021). In this light, "physical loss" would apply to property destroyed by some force, contrasted with "physical damage" which would cover a lesser extent of harm short of destruction or ruin. Thus, the policy would extend to the continuum of harm from total (loss) to partial (damage) resulting in alteration to an insured property. *See Robert E. Levy D.M.D., LLC*, 2021 WL 598817, at *11. This is a far more reasonable construction than interpreting "direct physical loss" to mean "direct physical loss of use," which frankly makes no sense.

*Id.* at 4.

Based on this definition of "direct physical loss," the court found that there was no coverage under the policy. *Id.* at 5.

Finally, the court in *LexFit* considered whether the "direct physical loss" provision of the plaintiff's insurance policy covered economic losses it suffered when it was forced to close due to COVID-19. *LexFit, LLC v. W. Bend Mut. Ins. Co.*, No. CV 5:20-413-DCR, 2021 WL 2382519, at *1 (E.D. Ky. June 10, 2021). Citing and agreeing with *Bluegrass,* the court found that "direct physical loss" requires "tangible harm or damage to the property covered by the agreement. Accordingly, a purely economic loss cannot qualify as a 'direct physical loss.'" *Id.* at 4.

*Ashland*, *Bluegrass*, and *LexFit* are persuasive and applicable. The Court finds as a matter of law that "direct physical loss or damage to" requires "tangible harm or damage to the property covered by the agreement." *Id.*

In support of its claim that COVID-19 caused "direct physical loss or damage to" the "described premises," Wild Eggs alleges:

17. On March 11, 2020, the World Health Organization ("WHO") announced that the outbreak of the novel COVID-19, a contagious and infectious disease, constituted a worldwide pandemic.3 On March 13, 2020, President Trump declared a nationwide emergency due to the public health emergency caused by the COVID-19 outbreak in the United States.

18. COVID-19 is a deadly contagious and infectious disease that, as of December 3, 2020, has already infected over 13.6 million people and caused more than 269,700 deaths in the United States alone.4  The Centers for Disease Control and Prevention ("CDC") estimates that infection rates for COVID-19 are likely *at least ten times higher* than reported.5  No effective vaccine for COVID-19 has been approved for general circulation yet, although at the time of this filing several vaccines are moving toward the final stages of approval and are planned for initial distributions before the end of the year.

19. The incubation period for COVID-19 – the time between exposure and symptom onset – can be as many as fourteen (14) days.6  During this "pre-symptomatic period," infected persons can be contagious and disease transmission can occur before infected persons show symptoms or have any reason to suspect they are infected.7

20. COVID-19 spreads by human-to-human transfer, including through air droplets, aerosols, and fomites.8  The CDC published a study that concluded that "droplet transmission was prompted by air-conditioned ventilation," which caused an outbreak among people who dined in the same air-conditioned restaurant.9  Other reports indicate that COVID-19 spreads through aerosols and fomites as well as droplets.10  The WHO confirmed that COVID-19 travels through air and can contaminate objects and property surfaces.11

21. Individuals can become infected with COVID-19 through contact with inert, physical surfaces or objects used by an infected individual, regardless of whether that person was symptomatic.12  According to a study document in *The New England Journal of Medicine* and the National Institutes of Health, COVID-19 was detectable in the air and on property surfaces and objects up to eight hours on copper, up to twenty-four hours on cardboard, and up to three days on plastic and stainless steel, among other surfaces.13

22. Aerosolized droplets exhaled by normal breathing can travel significant distances and stay suspended in air for hours until gravity ultimately forces them to the nearest surface. Recent studies suggest that COVID-19 viral particles can remain viable for at least 28 days on non-porous physical surfaces, including plastic, stainless steel, vinyl, glass, paper, and polymer banknotes.14

23. COVID-19 physically attaches to air molecules and property. All coronaviruses, including COVID-19, are made up of three distinct parts: (1) genetic information contained in RNA; (2) a viral envelope; and (3) spike proteins.15  COVID-19 tangibly alters the integrity of property and contaminates property, including air at and away from Wild Eggs' locations, by viral particles attaching to property surfaces and its distribution in the air through droplets and aerosols.16  By attaching to air, surfaces, and objects, COVID-19 particles transform the atomic make-up of the air and the surfaces.

24. Distinct and demonstrable physical damage can occur at the molecular level and can be undetectable in a cursory inspection to the naked eye.

25.  COVID-19 has caused direct physical loss of or damage to property worldwide from its contamination and physical, tangible alteration of property surfaces, objects, and air, with ever-increasing staggering numbers of cases in the United States and other countries, indicating its ever-increasing presence everywhere worldwide.

26. COVID-19 also has caused direct physical loss of or damage to Wild Eggs' property because it made Wild Eggs' restaurants unsafe and uninhabitable for its business operations. COVID-19 physically occupied and contaminated the Wild Eggs restaurants, rendering the restaurants unusable in their normal capacity.

[DE 28 at 1182-85].

Nearly every assertion in Paragraphs 17-23 is supported by a citation.  Because Wild Eggs so diligently cited articles or reports in support of Paragraphs 17-23, its failure to do so in Paragraph 24-26 is conspicuous.  Paragraphs 24-26 consist of conclusory statements about the alleged "direct physical loss of or damage to" the "described premises." These statements are "naked assertion[s] devoid of further factual enhancement." *Ashcroft*, 556 U.S. at 678.  Indeed, other courts have found such allegations implausible. *Kevin Barry Fine Art Assocs. v. Sentinel Ins. Co., Ltd.*, 513 F. Supp. 3d 1163, 1171 (N.D. Cal. 2021)  ("The virus COVID-19 harms people, not property . . . KBFA does not, and could not plausibly, allege that its properties have been physically damaged by the virus causing its business losses");  *Pappy's Barber Shops, Inc. v. Farmers Grp., Inc.*, 491 F. Supp. 3d 738, 740 (S.D. Cal. 2020 ("Even assuming the truth of these allegations, the presence of the virus itself, or of individuals infected the virus, at Plaintiffs' business premises or elsewhere do not constitute direct physical losses of or damage to property");  *Uncork & Create LLC v. Cincinnati Ins. Co.*, 498 F. Supp. 3d 878, 884 (S.D.W. Va. 2020) ("Property, including the physical location of Uncork and Create, is not physically damaged or rendered unusable or uninhabitable . . . No repairs or remediation to the premises are necessary for

its safe occupation in the event the virus is controlled and no longer poses a threat").  Wild Eggs has not plausibly alleged "tangible harm or damage" to the "described premises." As a result, Wild Eggs is not entitled to business income and extra expense coverage for its claims.

      *b. Civil Authority Coverage*

The Policy provides civil authority coverage:

> When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:
>
> (1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of damage, and the described premises are within that area but are not more than one mile from the damaged property; and
>
> (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage . . .

[DE 28-1 at 1353].

State Auto argues that Wild Eggs is not entitled to coverage under this provision because the Orders were not "issued in response to any property damage at any premises in the area immediately surrounding any Wild Eggs location.  In fact, whether the neighbors of Wild Eggs had infected premises or completely sanitized premises, or even if Wild Eggs had no immediate neighbors, the civil orders still would have remained exactly the same."  [DE 29 at 1461]. Moreover, access to the "described premises" was not "prohibited" by the civil authority because "the orders state that carryout, delivery, and drive-thru services are specifically permitted" and "U.S. District Courts have agreed that access to a restaurant is not "prohibited" when carry-out and delivery services are permitted."  *Id.* at 1462.

Wild Eggs counters that "[f]or the same reasons that COVID-19 caused direct physical loss of or damage to Wild Eggs' property, the virus also caused dangerous physical conditions resulting from damaged property at premises within one mile of the Wild Eggs locations." [DE 30 at 1924]. Wild Eggs further argues that "the civil authority orders prohibited access to Wild Eggs' locations, the second element.  The orders prohibited dine-in restaurants from the core business operation of serving dine-in customers. Although the Policy does not require complete prohibition of access, State Auto contends that the orders must prohibit *all* access, while the civil authority orders authorized restaurants to provide carry-out, drive-through, and delivery services." *Id.* at 1924-25

The Court has found as a matter of law that "direct physical loss of or damage to" requires "tangible harm or damage to the property covered by the agreement." *LexFit*, 2021 WL 2382519 at *4.  Wild Eggs has not plausibly alleged that other properties within a one-mile radius of the "described premises" have suffered "tangible harm or damage." *See Chelsea Ventures, LLC v. Cincinnati Ins. Co.*, No. 20-13002, 2021 WL 2529821, at *8 (E.D. Mich. June 21, 2021)  ("But just as Chelsea was unable to establish that it sustained physical loss or damage to its property, the complaint fails to plausibly allege physical loss or damage to other property as a result of COVID-19").

And Wild Eggs has not plausibly alleged that the Orders "prohibited access" to the "described premises."  "Prohibited access" is not defined in the Policy, so the Court turns to the dictionary definition of that phrase. *See Meridian Citizens Mut. Ins. Co.*, 2010 WL 1253084, at *5 . "Prohibited" means "not permitted: forbidden by authority." *Prohibited*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/prohibited (last visited Sep. 14, 2021).  Access means "permission, liberty, or ability to enter, approach, or pass to and from a place or to approach or communicate with a person or thing." *Access*, MERRIAM-WEBSTER.COM,

https://www.merriam-webster.com/dictionary/access (last visited Sep. 14, 2021 "Prohibited access" means "not permitted" to "enter" the "described premises."  Because the Orders allowed Wild Eggs personnel to "enter" the "described premises" to prepare food for carry-out, drive-through, and delivery services,  Wild Eggs has failed to plausibly allege that it was prohibited from accessing them.  *See Bluegrass*, 2021 WL 1069038 at \*5 ("'Civil Authority' coverage sought by BOHC requires a claim for a tangible loss to property other than the insured property, which BOHC has failed to identify.  Further, the Civil Authority coverage does not apply because there is no allegation that BOHC lost access to its business due to damage to surrounding property"); *see also B St. Grill & Bar LLC v. Cincinnati Ins. Co.*, No. CV-20-01326-PHX-SMB, 2021 WL 857361, at \*6 (D. Ariz. Mar. 8, 2021)  ("Plaintiffs have failed to allege any damage to property that is not the insured premises. Even if they had, Executive Order 2020-09 did not prohibit access to the insured premises, but merely stated that on-site dining was prohibited");  *Raymond H Nahmad DDS PA v. Hartford Cas. Ins. Co.*, 499 F. Supp. 3d 1178, 1188 (S.D. Fla. 2020) ("Plaintiffs do not allege that they were prohibited from accessing the premises nor do they allege that they could not perform medically necessary non-elective medical procedures.  Merely restricting access to Plaintiffs' dental practice for essential medical services does not trigger coverage under the Policy's Civil Authority provision").

### III.   CONCLUSION

Having thus considered the parties' filings and the applicable law, and being otherwise sufficiently advised, the Court **HEREBY ORDERS AS FOLLOWS**:

(1) The Court finds that the exercise of its jurisdiction over this declaratory judgment action under 28 U.S.C § 2201 is proper.

(2) State Auto's Motion To Dismiss Amended Complaint, [DE 29], is **GRANTED**.

(3) This matter is **DISMISSED** with prejudice and **STRICKEN** from the Court's active
docket.

(4) The Court will enter a separate Judgment.

Rebecca Grady Jennings, District Judge
United States District Court

September 16, 2021